# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

PAUL GEORGE PETERSON,

      Plaintiff,

vs.

MARK PROSSER, CHIEF OF POLICE OF
STORM LAKE, IOWA, INDIVIDUALLY
AND ON BEHALF OF THE CITY OF
STORM LAKE, IOWA, AN IOWA
MUNICIPAL CORPORATION, *et al.*,

      Defendants.

No. C08-4005-MWB

**REPORT AND
RECOMMENDATION ON
MOTION FOR SUMMARY
JUDGMENT**

---

## I. BACKGROUND

On January 22, 2008, the plaintiff Paul George Peterson filed a 78-page Complaint, Doc. No. 5[1], alleging a myriad of claims against a diverse array of defendants. The defendants included several police officials, the present and a former Storm Lake City Attorney, an Assistant Storm Lake City Attorney, the Storm Lake City Administrator, the Storm Lake Library, the director of the Cherokee Mental Health Institute, several state court judges, the Iowa Attorney General, the Iowa Ombudsman, the Iowa Supreme Court, the Administrator of the Iowa Attorney Disciplinary Board, the Executive Secretary of the Iowa Judicial Qualifications Commission, the Storm Lake Times, The Storm Lake Pilot Tribune, Iowa State Public Defender John Laughlin, an Assistant United States Attorney, a Presbyterian minister, and an official with the Presbyterian Church.

---

[1]The Complaint was docketed on January 23, 2008, after it was faxed to the Clerk of Court on January 22, 2008. The plaintiff had obtained prior authorization from the court to file the Complaint by fax, so the court entered an order deeming the filing date as January 22, 2008. *See* Order Nunc Pro Tunc, Doc. No. 3.

Because the Complaint was largely uncomprehensible, the court ordered Peterson to amend the Complaint to conform with the requirements of the Federal Rules of Civil Procedure. Doc. No. 4. Eventually, Peterson filed an Amended Complaint, Doc. No. 13, containing 22 counts alleging claims against 22 defendants. After the court dismissed several of the claims and defendants, *see* Doc. No. 18, fourteen claims remained against six defendants.

The defendants remaining in the case are Storm Lake Chief of Police Mark Prosser; Storm Lake Police Officers Todd Erskine, Ray Eickholt, Joey Speers, and Chris Cole; and Storm Lake City Administrator Patti Moore. Peterson's remaining claims against these defendants are for false arrest, criminal assault, falsifying public documents, criminal conspiracy to falsify public records, evidence tampering, conspiracy to induce false testimony, intentional infliction of emotional distress, defamation of character, violation of civil rights (including retaliation for exercising his right of free speech), criminal conspiracy to violate constitutional rights, perjury, malicious prosecution, false imprisonment, and obstruction of justice. *See* Chart of Parties and Claims, attached to Order by Judge Mark W. Bennett dated April 23, 2008, Doc. No. 18. The court presumes all of Peterson's claims are being asserted in federal court pursuant to 42 U.S.C. § 1983.

Unless otherwise indicated, the following facts are either undisputed or viewed in a light most favorable to Peterson. The events giving rise to this lawsuit began on the night of January 21, 2006, during what appears to have been a routine traffic stop. Two Storm Lake, Iowa, police officers, defendants Eickholt and Speers, were in the process of administering field sobriety tests to a motorist along the side of the road when Peterson drove by in his pickup truck. Peterson was concerned because it was cold outside and the motorist, 24-year-old Ricardo Perez, was not wearing a coat. Peterson stopped his truck and approached a police squad car parked at the scene.

Peterson alleges that he walked toward the squad car because he saw someone sitting inside, but when he got close to the car, he realized the car's occupant was not a police officer, so he returned to his truck. Doc. No. 13, Amended Complaint, ¶ 1. As he arrived back at his truck, one of the policemen, defendant Eickholt, ran across the street toward him. Peterson told Eickholt, "I think it is inhumane you won't let that boy put on a coat." Eickholt responded, "Get back in your truck," but within a second or two of this directive, and before Peterson had a chance to comply, Eickholt "grabbed [Peterson], without justification, and dragged him across the street, slammed his body onto the squad car, handcuffed him and then paraded him back in front of the video camera." *Id.*, ¶ 2.

According to the defendants, when Speers and Eickholt saw Peterson approach the squad car, they were concerned for several reasons: it was nighttime, the occupant of the car was a high school student on a "job shadowing" exercise, and they did not know who Peterson was or why he was walking up to the squad car. Doc No. 93-2, Defendants' Statement of Material Facts ("Def. Facts"), ¶¶ 5-7. They also were concerned because Peterson's vehicle was parked in the traveled portion of the street with its lights off. *Id.*, ¶ 15. Speers approached Peterson and asked him to leave the scene. Peterson did not comply, so Speers again asked Peterson to leave, and again Peterson did not comply. In his incident report, Speers states that he told Peterson to leave "3-4 times." Doc. No. 93–4, Defendants' Appendix ("Def. App."), Ex. 2, p. 4; *see also*, *id.*, Ex. 5, p. 30. In Eickholt's incident report, he states that Speers told Peterson to leave "at least two times." *Id.*, Ex. 3, p. 8; *see also*, *id.*, Ex. 5, p. 70. Peterson did not leave, but continued to complain about the way in which the officers were handling the traffic stop. As Peterson's protests became louder and he became more upset, Eickholt approached Peterson and told him to return to his vehicle. According to Eickholt, Peterson responded, "I refuse to leave while you violate this man's constitutional rights." Def. App., Ex. 5,

p. 71. Speers and Eickholt then grabbed Peterson, placed him against the squad car,[2] and arrested him. Def. Facts, ¶¶ 8-9; Def. App., Ex. 3, p. 8; Ex. 5, p. 14.

Speers then transported Peterson to the Buena Vista County Sheriff's office, where he was charged with "interference with official acts" and released. Def. Facts, ¶ 3. Eventually, after a bench trial, Peterson was found not guilty on this charge. Doc. No. 117, Plaintiff's Appendix ("Pl. App."),[3] Ex. 22.

About a week after the traffic stop, Peterson delivered a five-page, single-spaced, typed letter to the Buena Vista County Sheriff. Def. App., Ex. 6, pp. 110-114. The letter, captioned "Close to the Shootout," was a disjointed and angry diatribe concerning several seemingly unrelated matters and against a number of different individuals and organizations. Although in the letter Peterson specifically disclaimed any intent to engage in violence, he repeatedly referenced bullets, guns, killings, and death, as well as his belief in the impending violent deaths of himself and his mother. The letter began:

> I know we are close to the end of the story. My time is near. My mother told me this morning she cannot take this anxiety and fear anymore. She told me to leave this place. She does want to be remembered, however, as the person that first stated that it sounds like I was destined to lose all of my money, to lose all of my ability to live independently, so that I would be forced to come back to town, and be forced to bring some peace, and some happiness, and some sense of family back to her in her last days, and further, THAT IT SOUNDS LIKE I HAVE BLOWN INTO TOWN LIKE A "MARSHALL DILLON" so as to "TAKE OUT THE HOLIDAY BOYS" like this is DODGE, KANSAS, circa 1870 or so, because the way this stuff has been developing lately, it certainly seems like a shootout at the OK corral is in the making, and somebody is not going to survive.

---

[2]Speers testified that Peterson was right next to the squad car when he was arrested. Def. App., Ex. 5, p. 32.

[3]Plaintiff's Appendix is docketed as Doc. Nos. 117-2 through 117-48.

> Now, at this point, I must state that I do not believe in violence, I do not ascribe to the use of firearms to try to protect myself, I do not own a firearm, nor have I ever told any of the persons that have offered shiny little pieces of metal to me to protect what they say is my sorry ass from your shinies, if you get my drift.

*Id.*, p. 110.

After this introduction, Peterson described some of the circumstances surrounding his suspension from the practice of law in Illinois and his divorce, and he then descended into a rambling discourse on a number of matters, including his belief that the authorities were planning to have him and his mother killed because of the stance he took during the traffic stop on January 21, 2006. The following is an example:

> Will my mother SEE ME KILLED and get KILLED HERSELF TO SEAL THE TRUTH FROM TRUTH-SEEKING EYES? How will she die - I know you have sought out experts that have blood as cold as steal [sic] to discuss just how expertly they can make it look like the lady died of "natural cases", probably in bed, with a book in her hand, probably with a Sunday School lesson about justice, and mercy, close by, with the date 1/29/06 affixed on the top, planning to go to Sunday School at the Presbyterian Church in Storm Lake, Iowa, where Gary Lalone is now a deacon, or elder, I forget which, because I became so inflamed when I saw him take a sacred oath just a few short weeks ago, right after the Sunday School lesson preached about what we expect from elder leaders - ie that they not be DRUNKARDS, like he apparently was, when he was pulled outa da car next to the just OK corral (the Havens brothers, or as my mom wants to be remembered as chiming in as the "Holiday Boys" after she is smothered in her bed or something like it - if she doesn't eject me to the cold of uncertainty because she can't take all this

stress - out in the cold like the body of Perez is right now, if you get my drift!)

*Id.*, p. 113. Peterson also wrote the following run-on sentence about the traffic stop:

> I am so mad at you right now because you even now REFUSE TO HAVE CONTACT WITH ME AT THE VERY TIME I REPEAT AGAIN MY DEMAND FOR POLICE PROTECTION because my life is in danger at the hands of despicable and brutal and deceptive police in Storm Lake that almost killed Ricardo Perez on the street Saturday night last - if I had not intervened that vicious cop was going to accelerate his close-face to face, verbal and visual gesturing designed to provoke a response from Perez, age 24, that I even now believe may be already dead because the lawyer that was willing to check the jail web-site COULDN'T EVEN ACCESS THE SITE because someone in your jail had blocked access and now SINCE A FALSE POLICE REPORT WAS SWORN IN, NO LAWYERS IN TOWN WILL EVEN LOOK ME IN THE FACE - now, when I am penniless, and told to leave my mother's farm, and estranged from my brother because of the investigation that I have conducted into lies foisted by your OWN PROSECUTING ATTORNEY, designed to discredit DAVE PATTON TO THE EXTENT THAT HE WILL LOSE HIS OWN TRADE, DAMNED HIM (The Havens brother, not my brother, not the Patton brother, not your brother, brother)!

*Id.*, p. 111.

Peterson closed the letter with the following:

> Over and out. Signal getting dim. Words said and now resaid. I await the cup of death from your goons. Please allow my mom, Anne Peterson, TO DIE PEACEFULLY IN HER SLEEP, OK? Thank you for getting it done soon, of course. Back to business as usual. Please give your own kids a kiss for me since I can't kiss mine anymore. They won't listen anymore to bible stories because they are so bitter because of what I tried to do, just to make the world safe for bible stories. Why don't you pick one up and read it sometime - Maybe read it to one of your slaves - Oops, that may have

6

been a low blow, since you are atheist and all, or so it seems
when you won't call me to discuss this anymore because you
washed your hands of me, eh?

*Id.*, p. 114.

The letter was referred to the Storm Lake Police Department. After reviewing the
letter, defendants Erskine and Cole concluded that Peterson had mental health issues, and
they completed paperwork to have Peterson committed for a mental health evaluation.
Def. App., Exs. 7 & 8. Based on this paperwork, a state magistrate issued an Order for
Immediate Custody. Def. App., Ex. 9, p. 135.

At Peterson's request, defendant Moore, the Storm Lake City Administrator, agreed
to meet with Peterson on January 30, 2006, at the Storm Lake City Hall. During the
meeting, Peterson told Moore he wanted to be hired by the city as an "internal affairs"
investigator. He knew the city did not have such a position, but he thought the city needed
one, and he believed the city should hire him for the job. He reasoned that by hiring him,
the city could mitigate some of the damages he believed he was owed as a result of his
encounter with the police on January 21, 2006. According to Peterson, when he met with
Moore, "an EMPLOYMENT INTERVIEW WAS COMMENCED, and the parties
discussed salary, benefits, parameters of the job, the equipment necessary, ie: a 'scanner,'
a 'badge,' an old squad car, and nothing else, ie: no firearm would be necessary or even
advisable." Amended Complaint, ¶ 66. Moore denies that the meeting ever was an
"employment interview."

The defendants Prosser and Erskine took advantage of the fact that Peterson was at
City Hall to take him into custody pursuant to the Order for Immediate Custody.
According to Peterson, Prosser took him into another room, where Erskine "grabbed [his]
hands, and handcuffed him, and announced that [he] was being 'committed.'" *Id.*, ¶ 67.
According to Peterson, Prosser told him, "We are going to get you some help." *Id.*
Peterson was taken to the Cherokee Mental Health Institute, where he was diagnosed as

suffering from bipolar disorder. Pl. App., Ex. 33. After a hearing, his commitment was extended, and eventually he was released. Pl. App., Exs. 14 & 15.

On July 27, 2006, Peterson attended a pharmaceutical conference on the campus of Buena Vista University in Storm Lake, and allegedly disrupted a meeting.[4] Def. App., Ex. 11, pp. 141-43. As a result of this incident, the head of University Security advised Peterson, both verbally and in writing, that he was banned from the campus, and if he came onto the property in the future, the University would have him charged with trespass. *Id.*, Ex. 13, p. 145. After the warning, Peterson returned to the campus twice, once on December 3, 2006,[5] and again on January 12, 2007.[6] On both occasions, the University asked the Storm Lake Police Department to charge Peterson with trespass, and both times a magistrate signed a complaint and issued a warrant, and police officers placed Peterson under arrest.

On January 17, 2007, Peterson arrived at the Storm Lake City Hall and approached the front counter. He took out some papers and began to talk loudly to the person behind the counter about a number of topics, including marijuana as a treatment for cancer. He then expressed anger at having been arrested by Storm Lake police. As Peterson continued to talk, his voice became increasingly louder, and he started to lean in toward the person behind the counter. The person became "nervous and scared." Def. App., Ex. 17, p. 161. Another city employee became concerned with Peterson's aggressive tone, and approached Peterson and asked him if he "had any reason for being there." Def. App.,

---

[4]Apparently, Peterson wanted to discuss the legalization of marijuana. Def. App., Ex.11, pp. 141-42.

[5]Before the December 3, 2006, incident, Peterson asked the general counsel for the University if he could attend a political event on the campus. Peterson was told that he could not go on the campus. On December 4, 2006, Peterson advised the general counsel that he had attended a Unitarian Church service on the campus on December 3, 2006. Def. App., Ex. 14, p. 146.

[6]On January 12, 2007, Peterson entered the office of the University President to deliver a letter. Def. App., Ex. 8, p. 129.

Ex. 18, p. 167. Peterson backed up and toned down, but continued to talk. *Id.* Another city employee called the police. The police arrived and arrested Peterson for disorderly conduct.

On November 23, 2009, the remaining six defendants in this case filed a motion for summary judgment. Doc. No. 93. At Peterson's request, the deadline for responding to the motion was continued several times, with the last such continuance giving Peterson until March 1, 2010, to respond to the motion. Despite being warned repeatedly that the deadline for responding to the motion would not be continued further, Peterson did not file a timely response. At 4:30 p.m. on March 2, 2010, Peterson presented the Clerk of Court with a brief in response to the motion for summary judgment, together with a request for oral argument and an appendix. Doc. No. 117. The court, in the exercise of its discretion, will consider the untimely brief and appendix, but **denies** the request for oral argument. The motion for summary judgment now is fully submitted.

To resolve the issues raised in the summary judgment papers, the court first must sort out and make sense of Peterson's claims. This has proved to be a daunting task. At first reading, the claims appear to be not much more than a stream-of-consciousness harangue, but after a careful review of the materials submitted by the plaintiff, the court believes it can make some sense out of most of his claims.[7] After considering all of the

---

[7]Some of Peterson's allegations simply defy understanding. For example, in paragraph 82 of his Amended Complaint, he states the following, all in a single sentence:

> That Defendant Patti Moore, Storm Lake City Administrator, knows that Plaintiff was arrested 12/14/06, for the crime of attending a church service, 12/3/06, where and when the topic of discussion involving matters of religious "intolerance" and "heresy", and that Plaintiff had caused to be published a certain "letter to the editor", 12/9/06, in the Storm Lake Pilot Tribune, with various clear and ambiguous statements noting Plaintiff's dissident belief systems, regarding Unitarian "principles" about a historical religious figure, named Jesus Christ, as being fully "human", and also the matter of this historical religious figure's mother, the so-called "Virgin Mary", being also, in fact, "fully human", and questioning the "fact" that Jesus Christ was the product of a so-called "virgin birth", and also noting a historical religious figure, that was a "founder" of the "Unitarian" church and religion, MICHAEL SERVETES, was in fact, "burned at the stake" in

materials submitted by the parties in support of and in opposition to the defendants' motion for summary judgment, the court concludes that the defendants' motion for summary judgment should be **granted in part and denied in part**.

## II  STANDARDS FOR SUMMARY JUDGMENT

Judge Bennett discussed the standards for judgment recently in *Shannon v. Koehler*, ___ F. Supp. 2d ___, 2009 WL 4691603 (N.D. Iowa Dec. 4, 2009):

> Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1982, 167 L. Ed. 2d 929 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. Fed R. Civ. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to

---

October, 1553, furthermore, that Defendant Patti Moore, knows full well that Plaintiff was in fact "ejected" from a Presbyterian "Synod School" at Buena Vista University, 7/25/06, upon the "claim", as reported to the Storm Lake Police Department, and also to Co-Defendant, Mark Prosser, that Plaintiff was discussing a controversial "religious plank of support", of and by the "Presbyterian Church, USA", regarding to wit: "MEDICAL MARIJUANA" advocacy, and that both the "conditions precedent" and "condition subsequent", to that "criminal trespass" charge Plaintiff is still confronted to and with, under SMSM 38669, is in regards to controversial religiously related topics and subjects of free speech and other first amendment rights, roundly stated (ie: involving religious tolerance subjects, with related "establishment" issues, which Defendant Patti Moore knows, full well, to invoke Plaintiff's rights under Title 7, Civil Rights Act of 1964, roundly stated as well).

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Id*. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is material when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question[.]" *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a genuine issue of material fact is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir.

2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id*. at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*.

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials negating the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material

fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the

> court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. Fed. R. Civ. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

*Shannon*, 2009 WL 4691603, at **6-8.

With respect to each of Peterson's claims, the defendants have submitted materials that demonstrate the absence of a genuine issue of material fact. Thus, Peterson must "go beyond the pleadings and by affidavits, depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue of material fact." *Davis v. City of Albia*, 434 F. Supp. 2d 692, 697 (S.D. Iowa 2006) (citing *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir. 1999)); *see Grabovac v. Allstate Ins. Co.*, 426 F.3d 951, 955 (8th Cir. 2005) (non-moving party cannot simply rest upon the pleadings); *Baucom v. Holiday Companies*, 428 F.3d 764, 766 (8th Cir. 2005) (plaintiff may not rely on "mere allegations"). In assessing the motion for summary judgment, the court is to "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." *Howard v. Columbia Public Schl. Dist.*, 363 F.3d 797, 801 (8th Cir. 2004); *see* Fed. R. Civ. P. 56(e) (a party may not rely on his own pleadings in resisting a motion for summary judgment; any disputed facts must be supported by affidavit, deposition, or other sworn or certified evidence).

Peterson has attested to his version of the facts under penalty of perjury. Doc. No. 117, p. 41-42; Pl. App., Ex. 46, p. 72; *see* 28 U.S.C. § 1746; *see also*, Peterson's affidavit, Pl. App., Ex. 37. However, he has not responded separately to the defendants'

statement of material facts. *See* LR 56.1.b.3. Because he is a *pro se* party, the court will grant Peterson the latitude to present his claims and arguments even though he has not complied strictly with the rules. Therefore, the court will consider the factual allegations in Peterson's Amended Complaint, his response to the motion for summary judgment, and his affidavit to be Peterson's response to the defendants' statement of material facts.

## III  PETERSON'S CLAIMS

### A.  False Arrest and False Imprisonment

Peterson asserts claims of false arrest against defendants Eickholt, Speers, Prosser, Erskine, and Cole, and a claim of false imprisonment against Erskine. Peterson claims his arrest on January 21, 2006, was unlawful, and that he is entitled to recover damages from defendants Eickholt and Speers because of that arrest. Amended Complaint, ¶¶ 1-5, 16-17, 26-30. Peterson also claims the Order for Immediate Custody issued on January 30, 2006, resulting in his civil commitment, was unlawful, and that he is entitled to recover damages from defendants Prosser, Erskine, and Cole as a result of their roles in obtaining and executing the Order. *Id.*, ¶¶ 46-56, 66-67, 75. He also claims he is entitled to recover damages for false imprisonment from defendant Erskine as a result of his commitment. Amended Complaint, ¶¶ 49-52, 65. Finally, Peterson claims his arrest on January 17, 2007, was unlawful, and that he is entitled to recover damages from defendants Prosser and Erskine because of that arrest. *Id.*, ¶¶ 64-65, 70-71.[8] Thus, Peterson is asserting a claim of false arrest arising from three incidents: his arrest for interference with official acts on January 21, 2006; his civil mental health commitment on January 30, 2006; and his arrest at City Hall on January 17, 2007.

---

[8]Peterson also appears to be claiming that the arrests on December 3, 2006, and January 12, 2007, were unlawful, but it does not appear he is making a claim against any of the defendants as a result of these arrests. In any event, the record demonstrates that the arrests were lawful

Under Iowa law, the essential elements of a false arrest claim are "(1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint." *Children v. Burton*, 331 N.W.2d 673, 578-79 (Iowa 1983). There is no question that Peterson was detained against his will on all three of the occasions. The issue in each instance, therefore, is whether the involuntary detention was unlawful. The court first will address the issue with respect to the warrantless arrests on January 21, 2006, and January 17, 2007, and then with respect to the civil mental health commitment on January 30, 2006.

### 1. *January 21, 2006, Arrest*

There is no dispute that when Peterson was arrested by defendants Eickholt and Speers for interference with official acts on January 21, 2006, he was detained against his will based on a warrantless arrest. "Once a plaintiff shows a warrantless arrest, the burden of proof shifts to the defendant to show justification for the arrest." *Children*, 331 N.W.3d at 579. The question here is whether, viewing the record in the light most favorable to Peterson, and giving him the benefit of all reasonable inferences that can be drawn from the facts, a reasonable fact-finder could find that Peterson's arrest was justified.

"A peace officer in Iowa may make a warrantless arrest when he has reasonable ground for believing that an indictable public offense has been committed and has reasonable ground for believing that the person arrested has committed it." *Id.*; *see* Iowa Code § 804.7(3). "The expression 'reasonable ground' is equivalent to traditional 'probable cause.'" *Children*, 331 N.W.3d at 579. "Probable cause must be determined on the particular facts in each case. . . . The significant point is that courts look to the facts within the officers' knowledge at the time the arrest is made." *Id.*, 331 N.W.2d at 580 (citation omitted). "Probable cause exist[s] if 'the totality of facts based on reasonably trustworthy information would justify a prudent person in believing' that [the defendant]

committed an offense." *Murray v. Lene*, ___ F.3d ___, ___, 2010 WL 610039 at *3 (8th Cir. Feb. 23, 2010) (citing *Flynn v. Brown*, 395 F.3d 842, 844 (8th Cir. 2005)). "When an officer acts with probable cause, he is protected [from civil claims] even though the person arrested turns out to be innocent." *Children*, 331 N.W.3d at 579.

In *Leventhal v. Schaffer*, 612 F. Supp. 2d 1026 (N.D. Iowa 2009), Judge Bennett discussed probable cause for a warrantless arrest in the context of a civil claim for false arrest:

> The Eighth Circuit Court of Appeals recently explained the following regarding the probable cause requirement:
>
>> A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause. *See* U.S. Const. amend. IV; *United States v. Watson*, 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976). Probable cause exists when the totality of the circumstances shows that a prudent person would believe that the arrestee has committed a crime. *See Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). Exculpatory evidence is therefore relevant to whether an officer has probable cause. *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). Officers are not required to conduct a "mini-trial" before arrest, but probable cause "does not exist when a 'minimal further investigation' would have exonerated the suspect." *Id*. at 650 (citations omitted).
>
> *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is

committing an offense." *United States v. Quiroga*, 554 F.3d
1150 (8th Cir. 2009) (citing *United States v. Torres-Lona*, 491
F.3d 750, 755 (8th Cir. 2007)).

*Leventhal*, 612 F. Supp. 2d at 1043. Judge Bennett further observed that "[i]n dealing with civil damage actions for false arrest, courts apply a probable cause standard less demanding than the constitutional probable cause standard in criminal cases. If the officer acts in good faith and with reasonable belief that a crime has been committed and the person arrested committed it, his actions are justified and liability does not attach." *Id*.

According to Peterson, on January 21, 2006, he observed a motorist along the side of the road being questioned by police. The temperature outside was cold, and the motorist was wearing only a t-shirt and shorts. Peterson was concerned about the welfare of the motorist, so he stopped his vehicle to investigate. He parked his vehicle across the street from the traffic stop, and walked across the street toward a squad car parked near where the officers were questioning the motorist. When he got close to the car, he realized the car's occupant was not a police officer, so he walked back toward his vehicle. As he arrived back at his vehicle, one of the policemen, defendant Eickholt, ran across the street toward him. Peterson told Eickholt, "I think it is inhumane you won't let that boy put on a coat." Eickholt responded, "Get back in your truck," but within a second or two of this directive, and before Peterson had a chance to comply, Eickholt grabbed Peterson and dragged him across the street, slammed his body onto the squad car, handcuffed him, and placed him under arrest for interference with official acts. The question here is whether, based on these facts, Eickholt and Speers acted in good faith and with reasonable belief that Peterson had committed the crime of interference with official acts.

Under Iowa law, a person commits the misdemeanor crime of "interference with official acts" if the person "knowingly resists or obstructs anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer." Iowa Code § 719.1(1). The code excludes

18

"verbal harassment" from the definition of "interference," unless the verbal harassment is accompanied by a verbal threat and the person has the present ability and apparent intention to execute the verbal threat physically. *See Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1106 (8th Cir. 2004) (citing Iowa Code § 719.1(3)).

In *Lawyer*, the Eighth Circuit Court of Appeals discussed Iowa Code § 719.1:

> "The purpose of criminalizing conduct that interferes with official police action is to enable officers to execute their peace-keeping duties calmly, efficiently, and without hindrance." *State v. Buchanan*, 549 N.W.2d 291, 294 (Iowa 1996). The key question is whether the officer's actions were hindered. *Id.* One may "resist" an officer under the Iowa statute without using physical force. *See State v. Donner*, 243 N.W.2d 850, 854 (Iowa 1976); *State v. Brecunier*, 564 N.W.2d 365 (Iowa 1997) (upholding conviction for "resisting" officer under Iowa Code § 719.1 where defendant shined flashlight into officer's eyes to blind him, and hid gun for which officers were looking). Though still subject to the limitation of Iowa Code § 719.1(3), the term "obstruct" is considered broader than "resist," and "includes putting obstacles in the path of officers completing their duties." *State v. Hauan*, 361 N.W.2d 336, 339 (Iowa Ct. App. 1984). While the Iowa courts have said that the use of actual or constructive force is sufficient to support a violation of § 719.1, *Donner*, 243 N.W.2d at 854; *State v. Turk*, 595 N.W.2d 819, 822 (Iowa App. 1999), we have found no case holding that the use of such force is required to establish a violation. Only one published Iowa case even mentions the statutory exclusion of § 719.1(3), and it does not inform us about the scope of the term "verbal harassment." *See State v. Smithson*, 594 N.W.2d 1, 3 (Iowa 1999) (declining to reach whether defendant engaged in resistance or obstruction when, in defiance of a police order to turn down the volume of an outdoor concert, he led the crowd in a chant against the police department).

*Lawyer*, 361 F.3d at 1107.

Applying this law, and viewing the facts in a light most favorable to Peterson, no reasonable officer could have concluded, in good faith, that Peterson had committed the crime of "interference with official acts." According to Peterson, he merely walked toward the scene of a traffic stop, looked into a squad car, and then, without doing anything else, retreated to his vehicle across the street. When an officer approached him, he told the officer he believed the officers were mistreating the motorist. The officer told Peterson to get back into his vehicle, but before Peterson had a chance to comply, he was arrested. Under this version of the facts, no reasonable officer could have found, in good faith, that Peterson had resisted or obstructed anyone. Of course, under the defendants' version of the facts, there was ample probable cause to support the arrest. This simply means probable cause is a question that must be left to the fact finder.[9] *See Leventhal*, 612 F. Supp. 2d at 1044.[10]

The defendants assert that they are protected from this claim by qualified immunity. Doc. No. 93-1, p. 12-13. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. ___, ___, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)).

---

[9]A videotaped statement given by James Lewis, a bystander, and video from a squad car camera recording of the incident both substantially corroborate Peterson's version of the events, as does an affidavit, Pl. App., Ex. 39, signed by Perez, the traffic-stop suspect. (Peterson submitted to the court a videotape containing the video evidence in support of his resistance to the defendants' motion for summary judgment.) Lewis also gave testimony during a deposition substantially consistent with his earlier statement. Pl. App., Ex. 45.

[10]The defendants cite *Crumley v. City of St. Paul*, 324 F.3d 1003 (8th Cir. 2003), a case with a similar fact pattern, for the proposition that the officers here had probable cause to arrest Peterson. *Crumley* was decided on the issue of collateral estoppel, *id.*, 324 F.3d at 1006-07, which is not an issue in the present case.

In *Shannon*, Judge Bennett discussed the doctrine of qualified immunity, as follows:

The United States Supreme Court has explained the reasoning behind the concept of qualified immunity: "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. In fact, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. ___, ___, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004) (KENNEDY, J., dissenting) in turn citing *Butz v. Economou*, 438 U.S. 478, 507, 98 S. Ct. 2894, 57 L. Ed. 2d 895 (1978)).

The Eighth Circuit Court of Appeals has recently repeated the two part test applicable to determining whether an official is entitled to qualified immunity: "To determine whether the defendants are entitled to qualified immunity, we ask (1) whether the facts alleged or shown, construed in the light most favorable to [the nonmoving party], establish a violation of a constitutional . . . right, and (2) whether that constitutional right was clearly established as of [the date of the alleged incident], such that a reasonable official would have known that his actions were unlawful." *Krout v. Goemmer*, 2009 WL 3172180, 4 (8th Cir. 2009) (citing *Pearson*, 129 S. Ct. at 815-16); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), overruled in part on other grounds by *Pearson*, 129 S. Ct. at 818); *Pearson*, 129 S. Ct. at 815 ("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). The official is entitled to qualified immunity

unless the court affirmatively answers both of these inquiries.
*See id.*

*Shannon*, 2009 WL 4691603, at *12. Accordingly, the court will determine whether Eickholt or Speers is entitled to qualified immunity by answering the following two questions: (1) do the facts alleged, taken in the light most favorable to Peterson, show that the officers' conduct violated a constitutional right, and, if so, (2) was the constitutional right so clearly established at the time so that a reasonable officer would understand his conduct was unlawful. *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009) (citing *Pearson*, 129 S. Ct. at 815-16).

The second question requires little discussion. The Fourth Amendment right to be free from arrest in the absence of probable cause is clearly established, *see*, *e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985), and any reasonable officer would be aware of that right. "It is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau v. City of Minneapolis*, ___ F.3d ___, ___ , 2010 WL 624300 at *10 (8th Cir. Feb. 24, 2010) (citing *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999)). Answering the first question is nearly as easy. Under Peterson's version of the facts, the officers did not have even "arguable probable cause" to believe Peterson had committed the crime of interference with official acts. *See Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). He simply walked up to a police car and then walked away, and while he was in the process of returning to his own vehicle, he made one innocuous comment to the officers, after which he was placed under arrest. The defendants are not entitled to qualified immunity under these facts.

Finally, the defendants argue that this claim is barred by the statute of limitations. Iowa Code § 670.5 provides, "a person who claims damages from any municipality or any officer, employee or agent of a municipality for or on account of any wrongful death, loss, or injury within the scope of section 670.2 or section 670.8 or under common law shall

commence an action therefor within two years after the alleged wrongful death, loss, or injury." *Cf. Goings v. Chickasaw County, Iowa*, 523 F. Supp. 2d 892, 915-20 (N.D. Iowa 2007); *Rosales v. Lewis*, 454 F. Supp. 956, 958-60 (S.D. Iowa 1978). Peterson's claim for false arrest arose on January 21, 2006, when the arrest occurred. He did not commence this action until January 22, 2008. However, January 21, 2008 was a federal holiday, and does not count in the time calculation. Iowa Code § 4.1(34). The deadline for filing the claim was January 22, 2008. Thus, the claim was timely filed, and is not barred by the statute of limitations.

Summary judgment on this claim should be denied to the defendants Eickholt and Speers.

### 2.      *January 17, 2007, Arrest*

On January 17, 2007, Peterson was detained against his will based on a warrantless arrest by defendants Prosser and Erskine for disorderly conduct. Again, the burden is on the defendants to show justification for the arrest. However, they only have to establish probable cause under the less demanding standards applicable in civil damages actions. *Children*, 331 N.W.2d at 579-80.

Iowa law provides that a person commits the crime of disorderly conduct when the person either "[m]akes loud and raucous noise in the vicinity of any residence or public building which causes unreasonable distress to the occupants thereof," Iowa Code § 723.4(3), or "[d]irects abusive epithets or makes any threatening gesture which the person knows or reasonably should know is likely to provoke a violent reaction by another." Iowa Code § 723.4(4); *see Leventhal*, 612 F. Supp. 2d at 1043-44. The undisputed record in this case establishes that on January 17, 2007, Peterson arrived at the Storm Lake City Hall and approached the front counter, where he took out some papers and began to talk loudly to the person behind the counter. He then expressed anger at

previous arrests by Storm Lake police. As he continued to talk, his voice became increasingly louder, and he started to lean in toward the person behind the counter, who became "nervous and scared."

While these facts are not overwhelming, they do satisfy the less demanding standards for evaluating probable cause applicable in civil damages actions, even after giving Peterson the benefit of all inferences from these facts. There would be no basis for a fact-finder to conclude that no reasonable officer would have believed he had probable cause to arrest Peterson for disorderly conduct.

Furthermore, the officers are entitled to qualified immunity for this arrest. The record does not show that the arresting officers in this case should have known it would be unlawful under the circumstances of this case to arrest Peterson for disorderly conduct. Summary judgment on this claim should be granted to the defendants.

### 3. January 30, 2006, Incident

On January 30, 2006, Peterson was taken into custody by defendant Prosser pursuant to an order that Peterson be committed for a mental health evaluation. Peterson contends the defendants Erskine and Cole obtained this order unlawfully for the purpose of discrediting his claim that the police had wrongfully arrested him on January 21, 2006. He also contends that the commitment order was obtained to give the City of Storm Lake an excuse for not hiring him as an "internal affairs" investigator. He further claims he was committed to discredit his civil rights claims arising from the refusal of the city to hire him for the internal affairs investigator position. Finally, he claims he was committed to discredit his numerous other claims, including his claims for criminal assault, violation of civil rights, criminal conspiracy, and malicious prosecution. He asks for a recovery on

this claim from defendants Prosser, Erskine, and Cole. He also asks to recover on a claim of false imprisonment against defendant Erskine.[11]

Other than Peterson's own unfounded speculations, there is no basis in the record to support these claims. The undisputed evidence in the record establishes that the commitment order was sought based on Peterson's "Close to the Shootout" letter, and on nothing else. That letter provided ample justification for the defendants to seek the commitment order, and for the judge to issue it. No relationship has been established between the issuance of the commitment order and any other claim. Summary judgment on these claims should be granted to the defendants.

## B. Criminal Assault

Peterson asserts claims of criminal assault against defendants Eickholt, Speers, Prosser, and Erskine. Peterson alleges these defendants assaulted him when they placed him under arrest. Amended Complaint, ¶¶ 2, 15, 17, 26, 33, 70. These claims appears to mirror Peterson's false arrest claims.

A person commits an assault when, without justification, the person does "(1) [a]ny act which is intended to . . . result in physical contact which will be insulting or offensive to another, coupled with the apparent ability to execute the act, or (2) [a]ny act which is intended to place another in fear of immediate physical contact which will be painful, injurious, insulting, or offensive, coupled with the apparent ability to execute the act." Iowa Code §§ 708.1(1), 708.1(2). Under Iowa Code § 804.8, "A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer

---

[11]"False arrest is indistinguishable from false imprisonment." *Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984); *Barrera v. Con Agra, Inc.*, 244 F.3d 663, 666 (8th Cir. 2001) ("In Iowa, false arrest is indistinguishable from false imprisonment.") "Both torts are defined as 'an unlawful restraint on freedom of movement or personal liberty.'" *Fakorzi v. Dillard's, Inc.*, 252 F. Supp. 2d 819, 833 (S.D. Iowa 2003) (citing *Valadez v. City of Des Moines*, 324 N.W.2d 475, 477 (Iowa 1982)). Accordingly, the court will consider the claims together.

reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest." Therefore, so long as the arrests in this case were lawful, and the officers did not use excessive force, Peterson cannot assert his assault claims.

With respect to the arrest of January 21, 2006, the court has found that there are genuine issues of material fact concerning whether Eickholt and Speers had probable cause to arrest Peterson. This means there is a triable issue of fact on the question of whether the arrest was lawful. If the arrest was unlawful, the officers were not justified in using force pursuant to Iowa Code § 804.8. Therefore, the court recommends the motion for summary judgment be denied with respect to Peterson's assault claims against Eickholt and Speers arising out of the January 21, 2006, incident. *See Shannon*, 2009 WL 4691603, at *38.

On the other hand, Peterson has raised no issues of material fact with respect to his other assault claims. The motion for summary judgment should be granted with respect to those claims.

### C. *Falsifying Public Documents*

Peterson asserts claims of falsifying public documents against defendants Eickholt, Erskine, Prosser, and Speers. Peterson claims these defendants prepared false public documents in connection with the January 21, 2006, incident. Amended Complaint, ¶¶ 9-11, 31-33, 36, 41-42, 59, 61. Peterson also claims these defendants issued false press reports in connection with his two arrests at Buena Vista University and his arrest at City Hall. *Id.*, ¶ 41.

To support this claim, Peterson has taken police reports, press releases, and other documents relating to his various encounters with the police and other public officials during 2006 and 2007, and nit-picked the documents in an effort to show they were false. The court has reviewed the documents in question, to the extent they have been provided

to the court by the parties, and finds there is no basis for this claim. While some of the documents are not entirely accurate, or are contradicted by other documents or testimony, there is insufficient evidence from which a reasonable fact-finder could find or infer that any of these documents was intentionally or recklessly falsified for any of the purposes alleged by the plaintiff. There has been no showing that the documents contained any "deliberate falsehoods" or that the officers acted with a "reckless disregard for the truth" when they prepared the documents. *Murray*, 2010 WL 610039, at **3-4.

Furthermore, the defendants have qualified immunity for this claim because Peterson has not established the intentional or reckless inclusion of false information in the documents. *See Morris v. Lanpher*, 563 F.3d 399, 403 (8th Cir. 2009) (citing *United States v. Ozar*, 50 F.3d 1440, 1443 (8th Cir. 1995)). The defendants are entitled to summary judgment on this claim.

### D. Criminal Conspiracy to Falsify Public Records

Peterson asserts claims of criminal conspiracy to falsify public records against defendants Eickholt, Erskine, Moore, Prosser, and Speers. Peterson claims these defendants conspired to falsify public documents in connection with the January 21, 2006, incident. Amended Complaint, ¶¶ 9-11, 23, 31-33, 36-37, 75.

As with Peterson's claim that the defendants falsified public records, this claim has no merit. There is no evidence of the grand conspiracy alleged by the plaintiff. The defendants are entitled to summary judgment on this claim.

### E. Evidence Tampering

Peterson asserts claims of evidence tampering against defendants Eickholt, Erskine, Moore, Prosser, and Speers. Peterson claims these defendants tampered with the evidence relating to the January 21, 2006, incident. Amended Complaint, ¶¶ 12-13, 38-39, 75. He

also claims defendants Erskine, Prosser, and Moore tampered with a surveillance video of his arrest on January 17, 2007, at City Hall.  *Id.*, at ¶¶ 65, 71, 76-77.

This is a fanciful and unsupported claim that has no support in the record. Summary judgment should be granted on the claim.

## F.  Conspiracy to Induce False Testimony

Peterson claims the defendants Eickholt, Erskine, and Speers conspired to induce false testimony at Peterson's trial on the interference with official acts charge.  Amended Complaint, ¶¶ 9, 20-21, 35, 61.

This claim has no support in the record, and is contradicted by sworn evidence. Summary judgment should be granted on the claim.

## G.  Intentional Infliction of Emotional Distress

Peterson asserts claims of intentional infliction of emotional distress against defendants Cole, Eickholt, Erskine, Moore, Prosser, and Speers.  Peterson claims these defendants intentionally inflicted emotional harm when they allegedly prepared false police reports and press releases about the January 21, 2006, incident.  Amended Complaint, ¶¶ 11, 22, 75.

The elements of intentional infliction of emotional distress in Iowa are (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) the plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.  *Fuller v. Local Union No. 106 of United Bhd. of Carpenters and Joiners of America*, 567 N.W.2d 419, 423 (Iowa 1997).  None of these elements has any support in the record.  Peterson has not shown that any of the information included in the police reports or in the press releases was

outrageous or was included for the purpose of causing him emotional distress. In fact, the police reports and press releases all were fairly bland and matter-of-fact.[12] Furthermore, although Peterson often exhibited symptoms of emotional distress during this time period, and continues to do so up to the present,[13] he has not shown that these symptoms were caused by any outrageous conduct on the part of the defendants. Summary judgment should be granted against Peterson on his intentional infliction of emotional distress claims.

## H. Defamation of Character

Peterson asserts claims of defamation of character against defendants Cole, Eickholt, Erskine, Prosser, and Speers. Peterson claims these defendants prepared and published false public documents in order to defame his character. Amended Complaint, ¶¶ 11, 22-24, 41.

"Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in

---

[12]For example, the press release for the January 21, 2006, incident read as follows:

On the evening of Saturday, January 21, 2006 at approximately 7:40 pm a Storm Lake Police Officer stopped a vehicle near the intersection of Erie Street and East Milwaukee Avenue for a traffic violation.

The Officer contacted the driver and determined that the driver was intoxicated. As the Officer was conducting a field sobriety test on the driver a second subject approached the Officer and driver identified as Paul Peterson, age 53 of Storm Lake.

Peterson was not involved in the traffic stop but interfered with Officers and protested their handling of the traffic stop and the subsequent sobriety test. Police ordered Peterson to leave the scene but he refused and continued to interfere with the traffic stop.

Police arrested Peterson and charged him with Interference With Official Acts. He was transported to the Buena Vista County Jail where he was booked and released pending a court date.

The driver of the vehicle identified as Ricardo Perez, age 24 of Storm Lake was charged with OWI and booked into the County Jail on a $1,950.00 cash bond.

Def. App., Ex. 4, p. 11.

[13]See Transcript of hearing, January 26, 2010, Doc. No. 115.

his reputation and good name. A cause of action for defamation is based on the transmission of derogatory statements, not any physical or emotional distress to plaintiff which may result." *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998). To establish a prima facie case of defamation, the plaintiff must show the defendant (1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff." *Kiesau v. Bantz*, 686 N.W.2d 164, 175 (Iowa 2004).

Peterson has failed to show that any of documents were defamatory or resulted in any injury to him. The defendants should be granted summary judgment on this claim.

## I. Violation of Civil Rights

Peterson asserts that defendants Cole, Eickholt, Erskine, Moore, Prosser, and Speers violated his civil rights by arresting him on January 21, 2006, in retaliation for his exercise of his right of free speech when he complained about the officers' treatment of the motorist during the January 21, 2006, incident. Amended Complaint, ¶¶ 2-4, 75.

In *Baribeau*, the court found that the defendants had arrested the plaintiffs in violation of their Fourth Amendment rights, and the defendants were not entitled to qualified immunity for the claim. The court then applied the principles of qualified immunity to the plaintiffs' claim that the defendants violated their civil rights by retaliating against the plaintiffs for exercising their First Amendment rights. The court pointed out that "the right to exercise First Amendment freedoms 'without facing retaliation from government officials is clearly established.'" *Baribeau*, 2010 WL 624300 at * 12 (citing *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)). The court then held as follows:

> "To prevail in an action for First Amendment retaliation, 'plaintiff must show a causal connection between a defendant's retaliatory animus and [plaintiff's] subsequent injury.'" *Osborne v. Grussing,* 477 F.3d 1002, 1005 (8th Cir. 2007) (alteration in original) (*quoting Hartman v. Moore*, 547 U.S.

250, 259 (2006)). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in" the decision to arrest. *Kilpatrick,* 499 F.3d at 767 (quoting *Wishnatsky v. Rovner*, 433 F.4d 608, 613 (8th Cir. 2006)). Furthermore, the plaintiffs must show that the retaliatory motive was a "but-for" cause of the arrest – ie., that the plaintiffs were "singled out" because of their exercise of constitutional rights. *Id.* Finally, the plaintiffs must show that the officers' "adverse action caused [them] to suffer an injury that would 'chill a person of ordinary firmness' from continuing in the protected activity.'" *Williams v. City of Carl Junction*, 480 F.3d 871, 878 (8th Cir. 2007) (quoting *Carroll v. Pfeffer*, 262 F.3d 847, 850 (8th Cir. 2001)).

*Id.* The court ruled that although the plaintiffs were arrested in violation of their Fourth Amendment rights, and had the right to pursue a section 1983 claim based on that violation, the officers were entitled to qualified immunity on the plaintiffs' retaliation claim. The court found that although the officers lacked even arguable probable cause to arrest the plaintiffs, "we cannot say that a reasonable jury could find that retaliatory animus was a substantial factor or 'but for' cause of the plaintiffs' arrest and detention." *Id.* This ruling controls in the present case. The defendants are entitled to qualified immunity on this claim because there is no proof of retaliatory animus, and Peterson has not shown that his protected comments immediately before his arrest were a substantial factor in officers' decision to arrest him.

Peterson further claims the defendants violated his civil rights by having him committed on January 30, 2006. *Id.*, ¶¶ 25, 42-56, 66-67, 75. There are no facts in the record to support this claim.

The defendants' motion for summary judgment on these claims should be granted.

### J.  Criminal Conspiracy to Violate Constitutional Rights

Peterson asserts claims of criminal conspiracy to violate his constitutional rights against defendants Cole, Eickholt, Erskine, Prosser, and Speers.  Peterson claims these defendants conspired to violate his constitutional rights in connection with the January 21, 2006, incident.  Amended Complaint, ¶¶ 2-3, 26, 31, 60, 69.  He also claims a criminal conspiracy to violate his constitutional rights in connection with his civil commitment on January 30, 2006.  *Id.*, ¶¶ 45-56, 66-67.

A claim of a conspiracy to violate constitutional rights under section 1983 requires proof of specific facts tending to show a meeting of the minds among the alleged conspirators.  *Murray*, 2010 WL 610039, at *2.  Such a claim has no support in this record.  Summary judgment should be granted to the defendants on the claim.


### K.  Perjury

Peterson claims the defendants Cole, Eickholt, Erskine, Prosser, and Speers committed perjury at his trial on the interference with official acts charge.  Amended Complaint, ¶¶ 20, 34-37, 40, 61.  Peterson also claims that defendants Erskine and Cole submitted false affidavits in support of his civil commitment on January 30, 2006.  *Id.*, ¶¶ 48-51, 72.  Finally, Peterson claims that defendant Cole submitted a false affidavit in support of the trespass complaint filed against him after he delivered a letter to the President of Buena Vista University on January 12, 2007 (*id.*, ¶ 73), and another false affidavit in support of Peterson's arrest at City Hall on January 17, 2007 (*id.*, ¶ 74).

With regard to testimony given by witnesses at Peterson's interference with official acts trial, the witnesses have absolute immunity from civil damages in a section 1983 action based on claims of perjury.  This is true even for witnesses who were police officers.  See *Briscoe v. LaHue*, 460 U.S. 325, 341, 345-46, 103 S. Ct. 1108, 1118, 1120-21, 75 L. Ed. 2d 96 (1983).  In *Briscoe*, the Supreme Court refused to carve out an

exception for police officer witnesses. The Court reasoned that a police officer witness "performs the same functions as any other witness: he is subject to compulsory process, takes an oath, responds to questions on direct examination and cross-examination, and may be prosecuted subsequently for perjury." *Id.*, 460 U.S. at 342, 103 S. Ct. at 1119.

With respect to the other allegations in support of this claim, they have no support in the record. The defendants' motion for summary judgment on this claim should be granted.

## L. Malicious Prosecution

Peterson asserts claims of malicious prosecution against defendants Cole, Eickholt, Erskine, Prosser, and Speers in connection with the January 21, 2006, incident. Amended Complaint, ¶ 2, 31, 35. The claim also is made in connection with his civil commitment on January 30, 2006. *Id.*, ¶ 25.

The elements of malicious prosecution are as follows: (1) a previous prosecution; (2) instigation of that prosecution by the defendant; (3) termination of that prosecution by acquittal or discharge of the plaintiff; (4) want of probable cause; (5) malice on the part of the defendant for bringing the prosecution; and (6) damage to the plaintiff. *Whalen v. Connelly*, 621 N.W.2d 681, 687-88 (Iowa 2000); *Wilson v. Hayes*, 464 N.W.2d 250, 259 (Iowa 1990).

With respect to the January 21, 2006, arrest, Peterson has established the first four elements, but he has offered no evidence of malice on the part of the officers who charged him, nor has he shown any damages. With respect to his civil commitment, Peterson was not acquitted or discharged, and no evidence has been submitted even to suggest the defendants were motivated by malice. Accordingly, summary judgment should be granted on this claim.

## M. *Obstruction of Justice*

Peterson asserts a claim of obstruction of justice against defendant Erskine in connection with the January 21, 2006, incident. Amended Complaint, ¶¶ 57-59. Peterson also claims Erskine obstructed justice when he arrested Peterson at City Hall on January 17, 2007. *Id.*, ¶ 64.

This claim has no support in the record, and is contradicted by sworn evidence. Summary judgment should be granted on the claim.

## IV. *CONCLUSION*

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party serves and files objections[14] to the Report and Recommendation by **April 1, 2010**, that the defendants' motion for summary judgment be **granted in part and denied in part**, consistent with this order. The claims against defendants Eickholt and Speers for false arrest and assault arising out of the January 21, 2006, incident should be allowed to proceed to trial. All of the remaining claims and defendants should be dismissed from the case.

**IT IS SO ORDERED.**

**DATED** this 4th day of March, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[14]Objections must specify the parts of the report and recommendation to which objections are made, and the parts of the record which form the basis for such objections. *See* Fed. R. Civ. P. 72.